UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL ACTION |
| v. : | NO. 07-CR-134-1 |
| : | |
| MUSA DONZO, Defendant : | |

**SURRICK, J.**                                                                                       **JULY 26, 2007**

### MEMORANDUM & ORDER

Presently before the Court is Defendant Musa Donzo's Motion To Suppress Defendant's Statement And Request For Hearing (Doc. No. 36) and Motion To Suppress Identification And Request For Hearing (Doc. No. 38).  The Suppression Hearing was held on two days, June 12, 2007 and on July 2, 2007.  For the following reasons, Defendant's Motions will be denied.

**I.     BACKGROUND**

The testimony and evidence presented at the June 12th hearing established the following facts.  At approximately 11:30 p.m. on September 22, 2006, Janel Samuels, an African-American woman, pulled into the parking lot of her Bensalem, Pennsylvania townhouse after working an eight-hour shift.  (Hr'g Tr. 6/12/07 at 5 (Samuels).)  Ms. Samuels's townhouse is situated on a cul-de-sac in a quiet suburban neighborhood.  (*Id.*)  There is only one entrance in and out of her development.  (*Id.*)  After stopping to get something to eat at a local Wendy's, Samuels pulled her BMW sedan into a parking spot in front of her townhouse and exited her vehicle.  (*Id.* at 6.)  As Samuels exited the vehicle, two black men approached her from the rear of her vehicle and attempted to engage her in conversation.  (*Id.*)  Samuels made a positive in-court identification of Defendant Musa Donzo as one of the men.  She was looking directly at his face throughout

the entire time that he spoke to her during the incident. Donzo spoke with a distinct Liberian accent. (*Id.* at 6, 8.) He asked Samuels if she knew where they could catch the bus to West Philadelphia. (*Id.* at 6.) Sensing trouble, Samuels told Defendant that there were no buses in her neighborhood and continued walking towards her front steps. (*Id.*) Defendant asked her again, but Samuels told him that she had to go inside to see her husband. (*Id.* at 6-7.) Defendant responded, "What husband?" and Samuels told him to mind his own business. (*Id.* at 7.) Defendant said, "Let me ask you one more question." He then pulled out a gun, clicked it twice and put it against her head. (*Id.*) While Defendant held the gun to Samuels's head, the other man grabbed her purse, and Defendant took her car keys out of her hand. (*Id.* at 9.) The other carjacker, who was wearing a hooded sweatshirt making it difficult for her to see his face, remained silent during the entire incident. (*Id.*)

As Samuels stood on her front lawn, the two men got into her car but had trouble with the unique ignition system of the BMW. (*Id.*) Believing that they might force her to start the car for them, Samuels ran across her lawn to her neighbor's house, which was about twenty feet away. As she ran she screamed, "They have a gun! They have a gun! They're gonna shoot me!" (*Id.* at 10.) Samuels's neighbor ran to the front door to let Samuels into the house. Samuels watched as Defendant and his partner jumped out of the car and ran from the area. (*Id.*) After Samuels was safely inside, the neighbor called the police. (*Id.*) The entire incident lasted between five to ten minutes. (*Id.* at 43.)

Detective Mark Kelly of the Bensalem Township Police Department responded to the 9-1-1 call. (*Id.* at 86 (Kelly).) When he arrived, Detective Kelly spoke with Samuels, who gave him a brief description of the carjackers. (*Id.* at 91-92.) Samuels told Kelly that the man with

the gun was black, stood approximately 5'4" tall, spoke with a Liberian accent, and had prominent lips.  (*Id.* at 39-40 (Samuels); *Id.* at 101 (Kelly).)  Samuels was confident that Defendant's accent was Liberian because she had worked with several people who had different African accents and because her daughter had dated a Liberian man.  (*Id.* at 8-9 (Samuels).)  Kelly was able to recover nine latent fingerprints from the inside of Samuels's BMW.  (*Id.* at 87 (Kelly).)   These fingerprints were fed into the Department's Automated Fingerprint Identification System ("AFIS").  (*Id.*)  On October 8, 2006, Kelly received information from the Department's fingerprint technician that AFIS had matched one of the fingerprints to Defendant, whose mug shot and fingerprints were in the system from a prior arrest.  (*Id.* at 88.)

Thereafter, Kelly inserted Defendant's information into the Computer Program Identification Number ("CPIN") system.  (*Id.*)   The CPIN system allows an investigating officer to create a photographic lineup for potential witnesses.  (*Id.*)  Some of the characteristics that are used to create the lineup included Defendant's height, weight, race, age, facial hair or lack thereof and complexion.  (*Id.*)  Although the CPIN system does not have a specific parameter for facial features, Kelly was able to compare Defendant's picture to others in the system in order to create a lineup of similar looking people.  (*Id.* at 90-91.)  After reviewing dozens of pictures, Kelly selected seven pictures and placed them on a single sheet of paper along with the Defendant's picture.  This photo array of eight pictures was shown to the victim.  (*Id.* at 93.)

Once Kelly completed the photo array, he called Samuels and asked her to come down to the Bensalem police station to view the photos.  (*Id.* at 99.) When she arrived at the station, Kelly and Samuels spoke briefly in a conference room where Kelly asked Samuels to try to recollect the events of September 22, 2006 and to try to recall the face of her assailant.  (*Id.*)

With these instructions, Kelly slid the photo lineup across the table to Samuels and asked her if she recognized anyone in the photographs. (*Id.* at 100 (Kelly).) Even though Defendant's picture immediately "jumped out at her" from the others, Samuels told Kelly that she wanted to take her time to make sure she was correct because she did not want to send another young black man to jail. (*Id.* at 12-13 (Samuels).) After careful review, Samuels identified Defendant's picture as that of her carjacker. (*Id.* at 13.) Kelly asked Samuels if she was sure, and Samuels responded, "I am positive." (*Id.*) Kelly then asked Samuels to sign her name next to Defendant's picture along with the date. Samuels complied. (*Id.*)

      The FBI assigned Agent Kenneth Vincent to the Samuels carjacking case. (*Id.* at 44 (Vincent).) On October 13, 2006, Agent Vincent agreed to meet with Detective Kelly and Detective Sergeant David Splain of the Yeadon Borough Police Department to discuss the Samuels incident and two carjackings that had recently occurred in Yeadon, Pennsylvania. (*Id.* at 45.) Based on their respective investigations, the three officers believed that Defendant may have been involved in all three carjackings. (*Id.*) At the time, Defendant was in jail in Philadelphia County as a result of being arrested on September 28, 2006 on an outstanding bench warrant for aggravated assault. (*Id.* at 45-46.)

      At Detective Kelly's request, Defendant was transported from the jail to the Bensalem Police Department. (*Id.* at 45.) Defendant was placed in an interrogation room where he was met by Kelly, Vincent, and Splain. (*Id.* at 46.) The officers identified themselves and before interrogating Defendant about his involvement in the carjackings, they questioned him to determine whether he spoke and understood English. (*Id.* at 47.) Defendant was asked how long he had been in the United States, what was the highest level of education he had reached, and

whether he was under the influence of any drugs or alcohol at the time. (*Id.*) Defendant told the officers in English that he was a native of Liberia but had come the United States in his early teens, had graduated from Bartram High School in Philadelphia, and was scheduled to begin taking college classes at Lehigh Valley College before his arrest.[2] (*Id.* at 47-48.) During this exchange with the officers Defendant was cooperative and had no problems understanding and speaking English as the officers talked to him. (*Id.*)

After Agent Vincent concluded that Defendant understood English, he informed Defendant that he had gathered some evidence that implicated Defendant in the Samuels carjacking and asked Defendant if he wanted to cooperate with their investigation. (*Id.* at 51-53.) Defendant agreed to cooperate. Splain then read Defendant his *Miranda* warnings aloud directly off of a written waiver form routinely used by the Yeadon Borough Police Department.[3]

---

[2]   Defendant referred to Lehigh Valley College as Lehigh Community College.

[3]   The Yeadon Borough Police Department waiver form reads as follows:

WARNINGS BEFORE QUESTIONING

Pursuant to law, I am informing you of the following rights, I am _____ of the Yeadon Police Department. I am investigating a _____

    1.    You have the right to remain silent, however if you say anything such can and will be used against you in a court of law. Do you understand this?

    2.    You have the right to talk to a lawyer before answering any questions and have a lawyer with you during questioning. Do you understand this?

    3.    If you cannot afford a lawyer, you have the right to have a lawyer appointed for you free of charge before any questions are asked and during any questioning. Do you understand this?

    4.    During questioning, you may stop at any time and refuse to answer any

As Splain read the rights, Defendant read the rights along with him. (*Id.* at 51-53, Hr'g Ex. G-2.) After reading Defendant each *Miranda* right, Splain asked Defendant whether he understood the right and whether he wished to waive that right. In each instance, Defendant answered "yes." (*Id.* at 52.) Defendant then signed and dated the waiver form, acknowledging that the *Miranda* rights had been read to him, that he had read them himself, and that he was knowingly and intelligently waiving his rights. (*Id.* at 53.)

At this point, Vincent and the other officers proceeded to question Defendant concerning his involvement in both the Samuels and Yeadon Borough carjackings. (*Id.* at 53-59.) During the questioning, Defendant made several incriminating statements. Initially, Defendant denied any involvement in the Samuels carjacking and maintained that he was simply providing his friends with a ride to Bensalem on September 22, 2006. (*Id.* at 55.) When Agent Vincent told Defendant that he had evidence suggesting that he was a part of the carjacking, Defendant

---

further questions. Do you understand this?

Understanding these rights, are you willing to give them up these rights [sic] and answer questions now?

I have read the above statement and fully understand each part of the statement and have no questions. It has been read to me and I have read it myself.

Date: _____   Time: _____   X: _____

These rights have been read and explained to _____

By _____ of the Yeadon Police Department.

Witness: _____

(Hr'g Ex. G-2.)

changed his story.  (*Id.* at 56.)  He told the officers that he was present at the carjacking, but only reached into the car to help get Samuels's keys back for her.  (*Id.* at 56-57.)  Samuels testified at the hearing that Defendant was the primary carjacker and that he never attempted to hand her back her keys.

      At the conclusion of the first hearing, counsel for Defendant argued that Defendant did not make a knowing and intelligent waiver of his rights because English was not his native language.  Counsel argued that because the officers knew that Defendant was not a native American and that his first language was not English, they had an obligation to determine whether Defendant's understanding of the English language was sufficient to permit him to understand the *Miranda* warnings.  Counsel suggested that although Defendant had some facility with the English language, it was not adequate to permit him to voluntarily and intelligently waive his *Miranda* rights.  (*Id.* at 110-112.)

      During the course of counsel's argument, counsel acknowledged that he has represented Defendant since before his arraignment.  He acknowledged that during the time that he has represented Defendant, he has communicated with him in English and has never needed an interpreter.  He also acknowledged that during the suppression hearing, he had no trouble communicating with Defendant in English.  Moreover, counsel conceded that Michael Finney, Deputy Clerk, had called him prior to the hearing to determine whether an interpreter was necessary.  Counsel advised Finney that there was no need for an interpreter.  (*Id.* at 118, 177.)

      In addition, during the course of counsel's argument, Defendant, who was seated at counsel table, tried to convince the Court that he did not fully understand what had transpired during the hearing.  Defendant advised the Court that he came to this country in 2003, that he

was still learning English, and that he had difficulty with the language. Defendant acknowledged that upon coming to the United States, he entered Bartram High School in Philadelphia, that the classes at Bartram were taught in English, and that he did not have an interpreter with him in his classes. Later, Defendant transferred to Communications Technical High School, where classes were taught in English. Defendant advised the Court that even though he had a problem with English, he graduated from Communications Technology High School in Philadelphia and enrolled in Lehigh Valley College. (*Id.* at 118-122.) Defendant was scheduled to begin at Lehigh Valley College when he was arrested.

After the hearing on June 12, the Court met with counsel. As a result of that meeting, a second hearing was scheduled for July 2, 2007, for the purpose of permitting the Government to address the issue of Defendant's alleged ability to understand English. Prior to the second hearing, counsel for Defendant requested an interpreter. Counsel advised the Court that Defendant's native language is Mandingo. A Mandingo interpreter was provided.

At the second hearing, the following facts were established by the evidence and testimony. Three witnesses, called by the Government, testified with regard to Defendant's ability to understand and communicate in English. The first witness was the co-defendant in this case, Joseph Jarlee. Jarlee has already entered a plea of guilty to the September 22, 2006 Samuels carjacking. Jarlee is a native of Liberia and is a friend of Defendant. Whenever Jarlee spoke to Defendant, it was only in English. Jarlee does not know how to communicate in Mandingo. (Hr'g. Tr. 7/2/07 at 7-8.) Jarlee and Defendant discussed the Samuels carjacking prior to committing the crime. Their conversations were always in English. (*Id.*) The second witness, Samson Bleh, met Defendant in 2006 when they were both playing soccer on a soccer

field in Southwest Philadelphia. Thereafter, Bleh saw Defendant almost every day, and whenever he saw Defendant, he always communicated with Defendant in English. (*Id.* at 24.) Finally, the Government presented Defendant's cousin, Bengali Donzo. Bengali Donzo and Defendant would converse in an "African English" (*id.* at 36), which Bengali described as "just a little different from English" (*id.* at 48). However, when Bengali Donzo and Defendant were with individuals who spoke a variety of African dialects, they would resort to communicating in ordinary English. (*Id.* at 49-50.)

In addition, at the second hearing, the Government offered four exhibits into evidence. Defense Counsel stipulated to their authenticity. The exhibits are Exhibit G-4, records from Lehigh Valley College, including the application filled out by Defendant; Exhibit G-5, school records from the School District of Philadelphia for Defendant; Exhibit G-6, school records from Bartram High School for Defendant; and Exhibit G-7, records from the Central Index System of the Immigration and Naturalization Service. The school records reveal, *inter alia*, that Defendant attended Bartram High School and graduated from Communications Technology High School. While a student in the Philadelphia School District, Defendant took such courses as English, Algebra, Biology, Public Speaking, Chemistry, Language Arts, Economics, Geography, History, Literature and Mathematics. These classes were all taught in English. The Lehigh Valley College records reveal that Defendant filled out a number of forms for the College. These forms were all written in English and required Defendant to read and answer a number of different questions in English.[4]

---

[4] It is interesting to note that several of these forms are like the waiver of rights form signed by Defendant, which required Defendant to read a question and then provide a yes or no answer.

Defendant testified at the second hearing using the Mandingo interpreter.[5] (*Id.* at 58.) Defendant testified that he was born in Liberia but was raised in Guinea. He indicated that his native language is Mandingo and that when he came to this country in 2003, he could not understand English. (*Id.* at 62.) He testified that he immediately entered Bartram High School where all of his courses were taught in English. (*Id.* at 63.) Bartram provided a class called "EASEL" which was designed to help students who do not speak or write English very well; however, Defendant also took the standard courses, taught in English, that all students took. Defendant transferred from Bartram High School to Communications Technology High School and graduated from Communications Technology High School in June 2006. (*Id*. at 65.) Defendant claims that while he can speak English, he does not understand the written word very well. (*Id.* at 66.) Defendant testified that when the police officers showed him the waiver of rights form, he did not read it because he was scared. (*Id.*) He claims that he did not tell the officers that his native language was Mandingo because he did not understand what was going on and did not understand the gravity of the case he was facing. (*Id.* at 67.) Defendant claims that he signed the waiver of rights form only because he thought that if he signed it, he would get out of jail. (*Id.*) Defendant has no recollection of discussing the circumstances surrounding the Samuels carjacking with the officers. He claims he has no recollection of the conversation because he was scared. (*Id.* at 70.) He further asserts that although he completed the written application to Lehigh Valley College which was in English, he accomplished this because he was relaxed and not scared. (*Id*. at 74.) He did not understand the waiver of rights form

---

[5] Counsel advised the Court that Defendant requested the interpreter. Counsel also advised that Defendant wanted an interpreter only at hearings where he is going to testify. (*Id.* at 117.)

because he was scared and so did not read it. (*Id.*)

## II. DISCUSSION

Defendant presents two issues for our consideration.  Defendant contends that the Government's photographic line-up was "unnecessarily suggestive," violated his due process right to a fair trial, and should be suppressed.  (Doc. No. 38 at 3.)  Defendant also contends that his *Miranda* rights were violated because the Government failed to obtain a knowing and intelligent waiver of those rights before they interrogated him and elicited statements from him while in custody.

### A. Photo Array Unnecessarily Suggestive

"A due process violation can result when an identification procedure is so suggestive that it undermines the reliability of the resulting identification. Allowing a jury to consider an identification that is tainted by such a procedure can constitute reversible error entitling the defendant to a new trial." *United States v. Lawrence,* 349 F.3d 109, 115 (3d Cir. 2003) (citing *Foster v. California,* 394 U.S. 440, 442 (1969); *see also Neil v. Biggers,* 409 U.S. 188, 196 (1972) (pre-trial identification of a defendant is inadmissible at trial if the identification was made at a confrontation that was so "suggestive and conductive [sic] to irreparable mistaken identification that he was denied due process of law.").  "Showing a witness a photographic array can constitute a denial of due process when police attempt to emphasize the photograph of a given suspect, or when the circumstances surrounding the array unduly suggest who an identifying witness should select." *Lawrence*, 349 F.3d at 115 (citing *Simmons v. United States,* 390 U.S. 377, 383 (1968)).  "In evaluating the suggestiveness of a photographic array we examine the totality of the circumstances to determine whether the array's suggestiveness denied

the defendant due process." *Id.* (citing *Neil*, 409 U.S. at 199). The defendant has the burden of proving that the identification procedure was impermissibly suggestive. *Reese v. Fulcomer,* 946 F.2d 247, 259 (3d Cir. 1991).

Defendant claims that Detective Kelly's photo array, which placed his mug shot on a single piece of paper alongside seven other mug shots of similar likeness, was unnecessarily suggestive because Kelly failed to account for Defendant's unusually prominent lips when selecting other photos from the database. This argument is without merit.

The young men depicted in the photo array are all of the same race and share remarkably similar facial features to the Defendant, including lip size. The size and background of each picture is the same. The photos, which were presented to Samuels in black and white, are shaded equally and none of the pictures is distorted in any way. *United States v. Brown*, Crim. No. 06-126, 2006 WL 3041085, at *3 (D.N.J. Oct. 25, 2006) (citing *Lawrence*, 349 F.3d at 115) ("Minor differences in the background color, shading or angle of a defendant's photograph when shown as part of a photographic array . . . are not sufficient to render a pretrial identification unnecessarily suggestive."). The photo array prepared by Detective Kelly, (Hr'g Ex. G-1), is completely fair. There is nothing unnecessarily suggestive about it. In fact, we think that Detective Kelly would have been hard-pressed to find seven other pictures that resemble Defendant as closely as those used in the photo array in question. Moreover, there was nothing unduly suggestive about the procedure used by Detective Kelly in presenting the photo array to Samuels.[6] Counsel's argument that the photo array is unduly suggestive because of Defendant's

---

[6] We also note that there is no risk of misidentification. Defendant was standing in front of Samuels during the carjacking, and Samuels was looking at his face for most of the five to ten minutes that it took for this incident to unfold. She gave Detective Kelly an accurate description

lip size is patently ridiculous, and we reject it.

### B. Knowing and Intelligent Waiver

"A defendant may waive his *Miranda* rights if the waiver is made knowingly, intelligently, and voluntarily." *United States v. Pruden,* 398 F.3d 241, 246 (3d Cir. 2005) (citing *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In making this determination, our inquiry is two-fold:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* (internal citations omitted). Accordingly, the burden is on the Government to demonstrate by a preponderance of the evidence that Defendant was advised of his rights and voluntarily and knowingly waived them. *Colorado v. Connelly,* 479 U.S. 157, 168 (1986) ("Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence.") (internal citations omitted.).

The evidence presented during both suppression hearings overwhelmingly demonstrates

---

of Defendant and identified his picture at the photographic line-up several weeks after the incident. Samuels's identifications of Defendant both at the photographic line-up and at the suppression hearing were completely reliable. *See United States v. Sosa,* Cr. No. 05-44-1, 2006 WL 120042, at *3 (E.D. Pa. Jan. 11, 2006) (citing *Neil*, 409 U.S. at 199-200) ("In evaluating the risk of misidentification, a district court should consider and weigh the following factors: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.").

that Defendant could read, speak, and understand the English language when he agreed to waive his Fifth Amendment rights.

During the first hearing, the Government established that prior to giving Defendant his *Miranda* warnings, Defendant was asked a number of questions about his background. The questions were asked in English. Plaintiff answered each question in English and at no time asked any of the three officers for an interpreter. Detective Splain then read each of the four *Miranda* rights to Defendant as Defendant read along with him. Splain asked Defendant whether he understood and wished to waive each of his rights. Defendant responded verbally that he understood his rights and wished to waive them. Defendant then signed the waiver form, indicating that he had read his rights, his rights had been read to him, that he understood his rights, and that he wished to waive his rights. We reject categorically Defendant's assertion that he did not understand his rights and did not voluntarily and intelligently waive them. Defendant's testimony in this regard is simply not credible.

We note that Defendant was brought to the Bensalem Police Station from the Philadelphia County Jail where he was incarcerated on a warrant for aggravated assault. In addition, Defendants mug shot and fingerprints were in the system from a prior arrest. Defendant is not new to the criminal justice system. Moreover, Defendant came to this country in 2003, attended public high school in Philadelphia for three years, graduated from public high school and was enrolled in college at the time of this incident. The classes that Defendant took in high school, all of which were taught in English, the college application that he filled out in English, and the fact that Defendant communicates with his friends in English and even planned the instant carjacking with his co-defendant in English establishes beyond any doubt that

Defendant is fully capable of reading, speaking and understanding the English language. Defendant was fully capable of understanding Detective Splain when Splain read his *Miranda* rights to him.  And, he was fully capable of waiving or giving up those rights, which he did voluntarily and intelligently.  Our conclusion in this regard is further reinforced by the fact that counsel for Defendant has been communicating with Defendant in English since before the arraignment.  Counsel does not speak Mandingo but never felt it necessary to request the services of an interpreter to help him communicate with Defendant.  Counsel and Defendant have been preparing their defense and communicating with each other in English for months without any apparent difficulty.

  Under all of the circumstances, we are compelled to conclude that Defendant fully understood that he was giving up his right to remain silent and knew the consequences of his decision at the time of the interrogation.

  For the above reasons, Defendant's motions to suppress the photo identification and his statements will be denied.

  An appropriate Order follows.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | NO. 07-CR-134-1 |
| | : | |
| MUSA DONZO | : | |

**ORDER**

AND NOW, this 26th day of July, 2007, upon consideration of Defendant's Motion to Suppress Defendant's Statement (Doc. No. 36), Defendant's Motion to Suppress Identification (Doc. No. 38), and all documents filed in support thereof and in opposition thereto, it is ORDERED that the Motions are DENIED.

IT IS SO ORDERED.

BY THE COURT:

_____
R. Barclay Surrick, Judge