IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 07-CR-134 |
| MUSA DONZO | : | |

**SURRICK, J.**                                                                                                    **NOVEMBER 16, 2007**

### MEMORANDUM & ORDER

Presently before the Court is Defendant's Motion for Judgment of Acquittal and/or New Trial (Doc. No. 87-2, supplemented by Doc. No. 102). For the following reasons, Defendant's Motion will be denied.

**I.    BACKGROUND**

Defendant Musa Donzo was indicted on charges of attempted carjacking, in violation of 28 U.S.C. § 2119, and use of a firearm during a crime of violence, in violation of 28 U.S.C. § 924(c). Following a three-day trial, a jury found Defendant guilty on both counts. Defendant now seeks judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, or, in the alternative, a new trial pursuant to Federal Rule of Criminal Procedure 33.

The evidence against Musa Donzo was overwhelming. The following facts were established by the evidence and testimony at trial. On September 22, 2006, the victim, Janel Samuels, had completed her shift as a registered nurse and was returning to her home on Bensalem Avenue in Bensalem Township. (Tr. 73, 8/6/2007.) Samuels lives in a townhouse complex. There is one road shaped like a horseshoe that runs in and out of the complex. (*Id*. at 74.) Samuels drove into the complex, parked her car in front of her home and exited the vehicle.

(*Id*.) As she exited the car, she was approached by two men, Defendant Musa Donzo and co-defendant Joseph Jarlee.[1] (*Id*.) Defendant asked Samuels where he could find a bus to West Philadelphia. (*Id*. at 75.) Samuels informed him that he would have to leave the complex to catch such a bus. (*Id*.) Samuels testified that she was afraid at this point and was trying to move toward her house as she spoke. (*Id*.) Samuels told Defendant that she wanted to get home to her husband, who was waiting for her. (*Id*. at 75-76.) Defendant was within an arm's length of the victim and replied, "what husband?" (*Id*. at 76.) Defendant then drew a gun from the front of his pants, clicked it twice, and placed the gun against Samuels' head. (*Id*. at 76.) Defendant demanded that Samuels give him her pocketbook. (*Id*. at 78.) Samuels handed the pocketbook and her car keys to Defendant. (*Id*.) Defendant took the car keys and Jarlee took her pocketbook. (*Id*. at 77-78.) Defendant and Jarlee then got into Samuels' BMW and attempted to start the vehicle. (*Id*. at 79.) The car would not start. (*Id*. at 79, 81). When Defendant and Jarlee were unable to start the car, they fled. (*Id*. at 83.)

At trial, Samuels identified Defendant as the man who attempted to steal her car. (*Id*. at 76.) She was positive in her identification. (*Id*. at 77, 79.) Her identification at trial was consistent with her prior identifications of Defendant at an earlier court proceeding and during a photo-lineup presented to her by Bensalem police on October 9, 2006. (*Id*. at 83; Gov't Ex. 1.) Samuels testified that at the photo array Defendant's picture "jumped out" at her and that she was absolutely certain about his identity. (Tr. 85-86, 8/6/2007.) Samuels also identified her assailant as having a Liberian accent. (*Id*. at 115.) She is familiar with that accent because she frequently

---

[1] Jarlee entered into a cooperation plea agreement with the government and testified against Defendant at trial.

worked around Liberians and her daughter's fiance is Liberian. (*Id.*) Defendant was born in Liberia and came to the United States in September, 2003. (*Id.* at 40-41.)

Co-defendant Joseph Jarlee testified at trial. Jarlee is also from Liberia and came to the United States in 2002. (*Id.* at 144, 145.) Jarlee testified that on the night of September 22 he agreed to give Defendant a ride to Bensalem so that Defendant could pick up his car. (*Id.* at 148-150.) Jarlee drove Defendant to Bensalem along with a man named Francois. (*Id.*) At Defendant's direction, Jarlee waited outside the Creekside apartments complex for a man named Mohammed. (*Id.* at 154.) When Mohammed did not appear Defendant instructed Jarlee to drive to a nearby Wendy's restaurant. (*Id.* at 154-55.) In the restaurant parking lot, Defendant saw a black BMW. (*Id.* at 155.) Defendant instructed Jarlee to follow the BMW. (*Id.*) When Jarlee asked why they needed to follow the car, Defendant replied, "to take the car and get some money." (*Id.*) When Jarlee balked at this suggestion, Defendant offered him $200 from the proceeds after the stolen vehicle was resold. (*Id.* at 154-56.) Jarlee then followed the BMW. (*Id.* at 158.) When the BMW stopped, Defendant instructed Francois to get out of Jarlee's vehicle and walk past the BMW. (*Id.*) After Francois did this, Defendant exited Jarlee's vehicle and approached the BMW. (*Id.* at 159.) Defendant then signaled for Jarlee to get out of his vehicle and come to the victim's BMW. (*Id.* at 160.) Jarlee heard Defendant talking to Samuels asking where he could get a bus. (*Id.* at 160.) Jarlee testified that Defendant continued talking to the victim and that Defendant then pulled a handgun from his pants and pointed it at Samuels' head. (*Id.* at 161.) Jarlee testified that Defendant took Samuels' keys and her pocketbook, and handed the pocketbook to him. (*Id.* at 162.) Defendant then got into the BMW and attempted to start it. (*Id.* at 163-64.) Jarlee opened the door of the BMW to let Francois get in. (*Id.* at 164.)

Jarlee went back to his car. (*Id*. at 164-65.) When Samuels started screaming, Jarlee took off, leaving Defendant and Francois. (*Id* at 163-165.)

Bensalem Police Detective Mark Kelly processed Samuels' car and lifted nine latent fingerprints from it. (Tr. 43, 8/7/07.) He submitted these prints to a fingerprint expert, Warminster Detective James Boston. (*Id*. at 148.) Detective Boston later informed Detective Kelly that he could not eliminate Defendant as a suspect, and suggested that Kelly include Defendant in a line-up for potential victim identification. (*Id*. at 127.) Detective Kelly created an eight-person photo array using the Pennsylvania State Police database to insure that the seven other suspects looked similar to Defendant. (*Id*. at 50-52.) On October 10, 2006, Samuels viewed the photo array and positively identified the photograph of Defendant as her attacker.[2] (*Id*.)

On October 13, 2006, Defendant was brought to the Bensalem Police Station, where he met with Detective Kelly, Yardley Detective David Splain, and FBI Special Agent Kenneth Vincent. (*Id*. at 53-54.) Prior to initiating their formal interview, the officers had an informal discussion with Defendant to get background information concerning his family, education and employment. (*Id*. at 54.) The conversation was in English and Defendant had no difficulty understanding and communicating in English. (Tr. 121, 8/6/2007.) The officers informed Defendant that they were investigating the attempted carjacking of the victim's vehicle on September 22, 2006, as well as other car thefts and they asked Defendant if he would like to talk to them about the crimes. (*Id*. at 121.) Defendant said he would. (*Id*.) Detective Splain then

---

[2] A Suppression Hearing was held on June 12, 2007 and July 2, 2007. Based on the evidence and testimony presented at the suppression hearing, we concluded that the photographic identification procedure was not unduly suggestive. (*See* Doc. No. 69.)

advised Defendant of his *Miranda* rights. (Tr. 96-98, 8/7/2007.) Detective Splain read the rights to Defendant and Defendant affirmed that he understood each right as it was read to him and he signed the *Miranda* right waiver form. (*Id*. at 98-99.) Defendant voluntarily agreed to be interviewed by the investigating officers. (Gov't Ex. 3.)

In his initial statement, Defendant told the investigating officers that on the night in question, he drove "Dreadlocks" (Jarlee) and another individual to Bensalem to pick up a car. (Tr. 127-29, 8/6/07.) He claimed that during the trip to Bensalem, the other two men talked about taking the vehicle they were picking up to a man who would change the vehicle identification number on it. (*Id*.) Defendant claimed that he dropped the two men off, then left the area. (*Id*.) The investigating officers informed Defendant that his version of events did not comport with the evidence they had obtained. (*Id*.)

Defendant then changed his story. He told the investigating officers that after dropping the two men off he heard a woman screaming in distress. (*Id*. at 131.) Defendant stated that he then stopped his car in order to assist the woman. (*Id*.) After agents confronted Donzo with the fact that they had evidence that he had been at or in the BMW, Donzo admitted that his fingerprints might be on the steering wheel because he reached into the car to help Jarlee start it. (*Id*. at 132.) Agents informed Donzo that his version was inconsistent and made no sense, and finally told him that Samuels had identified him as the gunman. (Tr. 58, 8/7/07.) Donzo responded by sitting back, putting his hands on his head, putting his head down, and saying nothing. (Tr. 130-33, 8/6/07.)

## II. LEGAL STANDARD

In considering a post-verdict motion for judgment of acquittal under Rule 29,[3] we must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The evidence must be examined as a whole in the light most favorable to the jury verdict, with the presumption that the jury properly evaluated the credibility of the witnesses, found the facts, and drew rational inferences. *See United States v. Iafelice*, 978 F.2d 92, 94 (3d Cir. 1992). The verdict of the jury must be upheld unless, viewing the evidence in this fashion, no rational jury could have found the defendant guilty beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984).

Rule 33(a) of the Federal Rules of Criminal Procedure provides that the court may exercise its discretion to grant a defendant a new trial if required in the interest of justice.[4] Such

---

[3] Federal Rule of Criminal Procedure 29(a) provides, in pertinent part: "The court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The "sole foundation upon which a judgment of acquittal should be based is a successful challenge to the sufficiency of the government's evidence." *United States v. Frumento*, 426 F. Supp. 797, 802 n.5 (E.D. Pa. 1976), *quoted in United States v. Carter*, 966 F. Supp. 336, 340 (E.D. Pa. 1997); *see also* 2A Charles Alan Wright, *Federal Practice and Procedure* § 466 (3d ed. 2000) ("There is only one ground for a motion for a judgment of acquittal. This is that the evidence is insufficient to sustain a conviction of one or more of the offenses charged in the indictment or information." (internal quotation marks omitted)).

[4] Federal Rule of Criminal Procedure 33(a) provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment."

motions should be granted sparingly and only where the failure to do so would result in a miscarriage of justice. *See United States v. Copple*, 24 F.3d 535, 547 n.17 (3d Cir. 1994). In considering a motion under Rule 33, "[t]he court may weigh the evidence, but may set aside the verdict and grant a new trial only if it determines that the verdict constitutes a miscarriage of justice, or if it determines that an error at trial had a substantial influence on the verdict." *United States v. Enigwe*, Crim. A. No. 92-00257, 1992 WL 382325, at *4 (E.D. Pa. Dec. 9, 1992) (citation omitted). In contrast to motions for judgment of acquittal under Rule 29, a motion for a new trial does not require the court to view the evidence in the light most favorable to the government. Rather, the court must weigh the evidence and evaluate the credibility of witnesses. *See United States v. Rennert*, Crim. A. No. 96-51, 1997 WL 597854, at *17 (E.D. Pa. Sept. 17, 1997) (citing *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985)).

### III.   LEGAL ANALYSIS

####    A.   Defendant's Motion For Judgment of Acquittal

As discussed above, we consider Defendant's Rule 29 Motion viewing the evidence in the light most favorable to the prosecution. *See Iafelice*, 978 F.2d at 94. We must sustain the verdict unless "no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *United States v. Stratton*, Crim. A. No. 99-326, 2000 WL 892840, at *3 (E.D. Pa. July 6, 2000) (quoting *United States v. Coleman,* 811 F.2d 804, 807 (3d Cir. 1987) (citation omitted)). "The evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Pungitore*, 910 F.2d 1084, 1129 (3d Cir. 1990).

*1.     Sufficiency of the Evidence Supporting Attempted Carjacking*

Defendant argues that the evidence adduced at trial was insufficient to sustain a conviction under the federal carjacking statute, 28 U.S.C. § 2119.  Under this statute, the Government must prove beyond a reasonable doubt that the Defendant: 1) with intent to cause death or serious bodily harm; 2) took a motor vehicle; 3) that had been transported, shipped or received in interstate or foreign commerce; 4) from the person or presence of another; 5) by force and violence or intimidation.  *United States v. Applewhite*, 195 F.3d 679, 684-85 (3d Cir. 1999) (citing *United States v. Lake*. 150 F.3d 269, 272 (3d Cir. 1998)).

a.     Intent to cause death or serious bodily injury

Defendant argues that the evidence offered at trial was insufficient to establish that he intended to cause death or serious bodily harm to the victim Janel Samuels on the night of September 22, 2006.  (Doc. No. 102 at 8.)  Defendant correctly notes that the Supreme Court in *United States v. Holloway*, 526 U.S. 1, 11-12 (1999), "requires the Government to prove beyond a reasonable doubt that the defendant would have at least attempted to seriously harm or kill the driver if that action had been necessary to complete the taking of the car."  *Id*.  Defendant argues that the placing of a gun against the victim's temple was not sufficient to satisfy this element.[5] (Doc. No. 102 at 9-10.)  The Government responds that the intent analysis must be made under a "totality of the facts and circumstances" standard.  *United States v. Anderson*, 108 F.3d 478, 485 (3d Cir. 1997).

---

[5]Defendant appears to concede that the action of placing a gun against the victim's temple is sufficient to establish the "violence or intimidation element."  (Doc. No. 102 at 9-10.)

Under the totality of the circumstances, it is clear that the jury could reasonably conclude beyond a reasonable doubt that the Defendant intended to kill or seriously harm the victim if necessary to accomplish his goal. Defendant was looking for a car to steal. He directed Jarlee to follow Samuels' BMW. As Samuels exited her vehicle, Defendant approached her. Defendant put the gun to Samuels' head. Samuels gave Defendant the keys to the car. Defendant got into Samuels car and attempted to start it. The jury could reasonably conclude that the Defendant intended to seriously harm or kill her if she did not comply with his demands. This is exactly the situation that the Third Circuit was dealing with in *United States v. Lake*, 150 F.3d 269 (3d Cir. 1998). Defendant's argument that the victim "was basically ignored" after she handed over her keys misses the point. The point is what would Defendant have done with the gun if Samuels had refused to hand over the keys. (Doc. No. 102 at 12.) The evidence adduced at trial was more than sufficient to establish Defendant's conditional intent to cause death or serious bodily harm if necessary to complete the carjacking. Accordingly, Defendant's motion for judgment of acquittal based upon the intent element will be denied.

        b.      From the person or presence of another

Defendant next argues that the evidence adduced at trial was insufficient to demonstrate that he attempted to take the victim's car "from [her] presence or person." (Doc. No. 102 at 13.) Defendant argues that the victim "was outside the vehicle" when Defendant attempted to start it and drive it away, and therefore it "was not legally in her presence." (*Id.*) Defendant also argues that he did not take the car from the person or presence of Samuels; he only took the keys. (*Id.* at 13-15.) Defendant's arguments are frivolous. The Third Circuit rejected similar arguments in *Lake*

9

making the following observation:

> "The carjacking statute's require that the vehicle be taken "from the person or presence of the victim" "tracks the language used in other federal robbery statutes" . . . Under these statutes, "property is in the presence of the person if it is 'so within his reach, observation or control, that he could if not overcome by violence or fear or prevented by fear, retain his possession of it."

*Lake*, 150 F.3d at 272 (citations omitted).

In this case, at the time of the attack, Samuels had just gotten out of her car and was in close proximity to it. She surrendered her keys at gun point. She could have prevented Defendant's seizure of the vehicle had she not been "petrified," and afraid that she was going to die. (Tr. 82, 8/6/2007.) The jury's determination beyond a reasonable doubt that the Defendant took the victim's vehicle from her person or presence on the night in question is supported by the evidence. Defendant's motion for judgment of acquittal based upon the "person or presence" element will be denied.

                          c.       Interstate or foreign commerce

At trial, the Government called John Quinn of the National Insurance Crime Bureau to address the interstate commerce requirement of the carjacking statute. (*See* Tr. 33-36, 8/7/2007.) Quinn testified that the NICB keeps millions of records which assist insurance companies with their investigation related to motor vehicles. (*Id*. at 34.) Among other things, the NICB keeps records of the VIN numbers of vehicles and the manufacturing and shipping records of automobiles. (*Id*. at 34-35.) Most of the manufacturers around the world including BMW provide the NICB manufacturing and shipping records of vehicles that they have manufactured. (*Id*. at 35.) Quinn testified that he reviewed the NICB database and determined that Janel Samuels' BMW was manufactured in Dingolfing, Germany, and that it was shipped from

Germany to Thompson BMW in Doylestown, Pennsylvania on June 26, 2003. (*Id*. at 36.) Quinn identified VIN Number of Samuels BMW as #WBAGN63433DR19471. (*Id*.) Quinn offered an affidavit from Donna Conick of the Managing Office of the NICB attesting to these facts. Defendant offered no objections to Quinn's testimony. (*Id*. at 35-36; Gov't Ex. 5.)

Defendant now contends that because Quinn did not testify that the database he used is accepted and relied upon by law enforcement agencies and the insurance industry, he failed to lay a sufficient foundation for the admissibility of his opinion. (Doc. No. 102 at 15.) A review of the transcript of Quinn's testimony reveals that Defendant is simply wrong. The Government laid the proper foundation for Quinn's testimony. Quinn specifically testified that law enforcement and insurance companies relied upon the NICB records. (*See* Tr. 33-36, 8/7/2007.) The foundation also included an explanation of Quinn's experience at the NICB, as well as his 31 years in law enforcement with the Philadelphia Police Department. (*Id*. at 34.) Quinn testified concerning the nature of the NICB's work, and laid a proper foundation for the admission of Government Exhibit 5, the affidavit addressing the origin of Samuels' BMW. (*Id*. at 36.) The testimony was admissible under Federal Rule of Evidence 803(17) and *United States v. Woods*, 321 F.3d 361 (3d Cir. 2003). Defendant's argument with regard to this foundation for Quinn's testimony is without merit. Defendant's motion for judgment of acquittal based upon the interstate commerce element will be denied.

      *2.*     *Sufficiency of the Evidence Supporting the Section 924(c) Conviction*

Defendant was also convicted of using a firearm in the commission of the carjacking, a crime that carries additional mandatory minimum sentences depending on the circumstances of the criminal action. *See* 18 U.S.C. § 924(c).

          a.        Predicate violent crime

Defendant argues that because the crime of carjacking was not established, there can be no predicate crime of violence and as such we must overturn his conviction under Section 924(c). Having found Defendant's arguments with regard to his carjacking conviction to be without merit, his argument regarding the predicate violent crime must also fail.

Defendant's motion for judgment of acquittal on the predicate violent crime element will be denied.

          b.        Failure to prove a firearm

Defendant argues that the Government failed to prove beyond a reasonable doubt that the device used by him in the attempted carjacking was a firearm under the applicable definition. *See* 18 U.S.C. § 921(a)(3). Defendant notes that no gun was recovered in this case. (Doc. No. 102 at 17). He argues that although both the victim and Jarlee testified that the Defendant used a gun, neither described the device in detail. (*Id.*) Defendant maintains that this lack of detail fatally undermines the reliability of the Government's evidence that he used a gun in commission of the attempted carjacking. (*Id.*)

The Government responds that in prosecutions under Section 924(c) where no firearm is recovered, it is permissible for a jury to accept the victim's testimony that the defendant used a firearm in the commission of the predicate crime. (Doc. No. 104 at 12 (citing *United States v. Beverly*, 99 F.3d 570, 572 (3d Cir. 1996)). In *Beverly*, the Third Circuit concluded that a rational jury could conclude that the defendant possessed a firearm when the only evidence to support that conclusion was the testimony of the victim. *Beverly*, 99 F.3d at 572.

In this case, Janel Samuels' testimony is corroborated by the testimony of Joseph Jarlee, Defendant's accomplice. (Tr. 161, 8/6/2007.) Jarlee's testimony mirrors Samuels' account. Defendant pulled out a handgun and pointed it at the Samuels' head. (*Id*. at 76, 161-62.) It is immaterial that neither witness described the handgun in detail. The jury was entitled to infer that the witnesses were capable of discerning what a handgun looked like and credit their testimony that Defendant used one. Defendant's motion for judgment of acquittal based upon the use of firearm element will be denied.

### B.    Defendant's Motion for New Trial

Defendant also contends that the Court should grant a new trial pursuant to Rule 33. (*See* Doc. No. 102.) He alleges six discrete errors at trial amounting to a miscarriage of justice and necessitating the granting of a new trial.

#### 1.    *Divergence of Testimony*

Defendant first argues that it was unreasonable for the jury to credit the testimony of both Janel Samuels and Joseph Jarlee since these two witnesses gave "distinctly different testimony as to the events of September 22, 2006." (Doc. No. 102 at 20-21.) Defendant does not explain what the salient differences were between the testimony of Samuels and Jarlee, or why those differences were so great that the jury was not entitled to take their testimony as credible. We have reviewed the testimony of both Samuels and Jarlee and find no significant inconsistencies in the testimony. Neither do we find anything in the record that would undermine the jury's verdict or suggest that it acted unreasonably or illogically. Defendant's motion for a new trial based upon the grounds of divergent testimony will be denied.

#### 2.    *Law Enforcement and Mere Bluff Jury Instructions*

Defendant next argues that a new trial is warranted because the Court erred in not giving two instructions proposed by Defendant to the jury during their charge. (Doc. No. 102 at 22.) The two proposed instructions were as follows:

> No. 10 - LAW ENFORCEMENT WITNESSES. The fact that a person is employed by a law enforcement agency does not mean that his or her testimony is worth more than any other witness. You should determine the credibility of this witness no different than any other witness.
>
> No. 23 MERE BLUFF INTENT. I instruct you that a "mere bluff" does not rise to the level of "intent to cause death or serious bodily harm." If you should find that a mere bluff occurred, then I instruct you that the Government has not proven beyond a reasonable doubt the element of intent for carjacking.

(Doc. No. 102 at 22.) Defendant argues that the failure to explicitly restate these instructions during the charge amounts to a violation of his due process rights.

The obligation of a court when charging a jury is "to provide the jury with guidelines so it may draw appropriate conclusions from the evidence . . . by a clear articulation of the relevant legal criteria." The Court must instruct them on the law without misleading or confusing them. *United States v. Messerlian*, 832 F.2d 778, 788 (3d Cir. 1987). As we noted when counsel raised this issue at trial, we declined to offer a specific instruction regarding the credibility of testimony by law enforcement officers because it had already addressed this issue during voir dire,[6] and

---

[6] During the voir dire we made the following statement to the jury and asked the following question:

> Ladies and gentlemen, all of the witnesses who appear in this matter take the witness stand on equal footing. The fact that a witness is a police officer or an ordinary citizen or whatever the status of the individual makes no difference in your determination of the credibility of that witness. It's your job as jurors to listen to the witness's testimony, to watch the witness testify, and to determine how you will assess the credibility of that witness.

14

because we provided a full discussion of credibility during the charge. (Tr. 33-34, 8/7/2007.) We determined that to include an additional instruction regarding the credibility of law enforcement officials was unnecessary. Defendant has offered no authority in support of his argument and we are aware of none.

With regard to the "mere bluff" instruction, Defendant cites an Eighth Circuit case for the proposition that the "defendant is entitled to an instruction on his theory of the case." (Doc. No. 102 at 23 (citing *United States v. Adcock*, 558 F.2d 397, 403 (8th Cir. 1977)).) We certainly do not dispute this statement as a general legal principle, but in the instant case, it is irrelevant. There was no evidence at trial to support the theory that Defendant was merely bluffing when he brandished the gun and held it to Janel Samuels' head. Janel Samuels certainly didn't think it was a bluff. Moreover, if the "mere bluff" defense was in any way part of Defendant's theory of the case, one would expect that it would have been mentioned in either his opening or closing statements. It was not.

Defendant's motion for a new trial based on the failure to include requested jury instructions will be denied.

### 3. *Failure of Witness Microphone*

---

> My question to you now is this, do any of you feel that you would automatically give a police officer more credence or more credibility than you would another witness notwithstanding that I've just indicated to you?
>
> If you feel you would automatically give a police officer more credibility, please raise your hand.

(Tr. 40, 8/6/2007.)

15

Defendant notes that the official transcript of the proceedings for day two of his trial, on August 7, 2007, contains the caveat: "Transcriber's note: Witness microphone not functioning during trial day after 9:47:23." (Doc. No. 102 at 23.) This same notation appears in the Court's copy of the transcript. We have reviewed the entire transcript from the second day of trial, and found no gaps in the transcription of the proceedings. More importantly, Defendant has failed to articulate how the failure of the witness microphone materially affected his rights during the course of his trial.

       4.    *Eyewitness identification*

Defendant objects to the admission of Janel Samuels' identification testimony at trial arguing that the photographic lineup was unduly suggestive. This issue was raised by Defendant in his Motion to Suppress Evidence. After a suppression hearing, we issued a Memorandum and Order denying the Motion to Suppress. (*See* Doc. No. 69.) Defendant's post trial motion has made no new argument and has identified no new evidence that would suggest the Court's denial of his motion to suppress the identification testimony of Janel Samuels was in error. There is no reason to now revisit our decision on this issue.

       5.    *Admission of Statement*

Similarly, Defendant's motion for a new trial on the grounds that his initial statement to police officials was inadmissible is merely a request for us to reconsider our denial of his pre-trial motion to suppress. (*See* Doc. No. 36, 69.) Again, Defendant has not identified anything new that would warrant reconsideration of our prior ruling on this issue.

6. *Exclusion of Yeadon Mis-Identification*

Finally, Defendant argues that we committed prejudicial error when we refused to permit him to introduce evidence that at about the time that Janel Samuels identified him in a police photo array, a victim in a completely unrelated case in another jurisdiction mis-identified him in a photo array. (Doc No. 102 at 25.) At trial, we determined that this evidence was not relevant and was therefore inadmissible. (Tr. 7-8, 8/6/2007.) Defendant argues that this ruling violated his due process rights.

Defendant cites *United States v. Stevens*, 935 F.2d 1380 (3d Cir. 1991) in support of his position. In *Stevens*, the Third Circuit discussed at length the admissibility of so-called "reverse 404(b)"[7] evidence, in which a criminal defendant seeks to introduce evidence of other crimes defensively, in the belief that the existence of such crimes will serve to exculpate him as regards the crime he is on trial for. *Id.* In *Stevens*, a defendant charged with a robbery and sexual assault sought to refute his identification by two victims by introducing evidence that the victim of another very similar crime had identified someone other than him as the perpetrator. In that case, the similarities between the two crimes were so great that even the Army Criminal Investigation Division responsible for investigating the crimes believed they were committed by a common

---

[7] Federal Rule of Evidence 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

perpetrator. *Id.* at 1401. Addressing the relevance question, the Third Circuit noted that "[t]he critical question is, of course, one of degree of similarity." *Id*   The Court reversed the district court's decision to exclude evidence of the second crime, holding that such evidence should be admitted "first, [if it] rationally tends to disprove his guilt, and second, passes the Rule 403 balancing test." *Id.* at 1406.

In this case, the "other-crime" evidence that Defendant sought to admit fails to meet the necessary threshold under both Rule 401 and 403, as framed in *Stevens*.  Unlike in *Stevens*, Defendant in this case made no effort to lay a foundation that the other-crime evidence he proffered bore any meaningful similarity to the crimes for which he was charged.  Indeed, the record contains almost no information regarding the Yeadon carjacking for which the Defendant was supposedly misidentified, other than the fact that it was a carjacking.  This dearth of evidence does not support a finding of relevance under Rule 401.  A "reverse 404(b)" argument might have been advanced had Defendant proffered evidence to suggest that the two crimes were of a signature nature or were marked by a common *modus operandi*, such that the Yeadon perpetrator might have been a suspect in this case.  Defendant, however, represented that he was not seeking to introduce the evidence "to prove there's somebody out there," but rather to show that "misidentifications can occur" and to determine "whether the identification [by the victim] in this case was proper."  (Tr. 6-7, 8/6/2007.)  In fact, Defendant conceded that the evidence was "not directly relevant to this case."  (*Id*. at 7.)

Defendant's motion for a new trial based on the exclusion of the unrelated misidentification will be denied.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 07-CR-134 |
| MUSA DONZO | : | |

**ORDER**

AND NOW, this 16th day of November, 2007, upon consideration of Defendant's Motion for Judgment of Acquittal and/or New Trial (Doc. No. 87-2, supplemented by Doc. No. 102) and all papers filed in support thereof and in opposition thereto, it is ORDERED that the Motion is DENIED.

IT IS SO ORDERED.

BY THE COURT:


/s/ *R. Barclay Surrick*
U.S. District Court Judge